**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiffs and the putative*
*FLSA Collective and Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENCHER MONTEBON, ANDREA AMAYA, NOE PALMA and ESTEBAN CUAHQUENTZI, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>-against-<br><br>ANTIQUE GARAGE, INC., A. G. TRIBECA, INC. and UTKU CINEL, Jointly and Severally,<br><br>                              Defendants. | **CLASS & COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Bencher Montebon, Andrea Amaya, Noe Palma and Esteban Cuahquentzi (the "Plaintiffs"), individually and on behalf of all others similarly situated, as collective and class representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

1

## NATURE OF THE ACTION

1.      Plaintiffs are current and former servers and bartenders, a former busser, a dishwasher and a line cook for Defendants' Mediterranean restaurants located in the SoHo and TriBeCa neighborhoods of Manhattan, New York. For their work, Plaintiffs were not paid minimum wages for all hours worked and were not paid overtime premiums for all hours worked over forty (40) in a given workweek. Further, Plaintiffs were not paid wages of any kind for certain hours that they worked, including but not limited to time spent attending mandatory staff meetings and completing their assigned job duties past the end of their scheduled shifts.

2.      Plaintiffs bring this action to recover unpaid minimum wages and overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq*. Plaintiffs also bring claims for unpaid spread-of-hours premiums, unlawfully withheld gratuities, and for failure to provide proper wage notices and wage statements pursuant to NYLL §§ 190 *et seq.* and the supporting regulations, as well as a claim for unpaid call-in pay pursuant to NY Comp. Codes R. & Regs. ("NYCRR") tit. 12 § 142-2.3 and NYCRR § 142-3.3.

3.      Plaintiffs bring their FLSA claims on behalf of themselves and all other similarly situated employees of Defendants.

4.      Plaintiffs bring their NYLL unpaid minimum wage, unpaid overtime, unpaid spread-of-hours, call-in pay, wage notice and wage statement claims on behalf of themselves and a Federal Rule of Civil Procedure 23 class of all non-management restaurant employees working for Defendants in New York during the six (6)-year period, plus COVID-19 tolling, preceding the filing of this complaint.

5.     Plaintiffs Montebon, Amaya and Palma also bring their NYLL unlawfully withheld gratuities claim on behalf of themselves and a subclass of all employees who worked for Defendants in New York in "tipped" positions, including, without limitation, servers, bussers and bartenders.

6.     Shortly after requesting information from Defendant Cinel about how Defendants calculated tip amounts for Defendants' tipped employees, Defendants reduced Plaintiff Montebon's hours and placed him on "on call" status without work from October 2020 through the present. Thus, Plaintiff Montebon brings individual claims for retaliation under § 215(a)(3) of the FLSA and § 215 of the NYLL.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

9.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The

thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a toll of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiffs:**

11.    Plaintiff Bencher Montebon ("Montebon") was, at all relevant times, an adult individual residing in Kings County, New York.

12.    Plaintiff Andrea Amaya ("Amaya") was, at all relevant times, an adult individual residing in Queens County, New York.

13.    Plaintiff Noe Palma ("Palma") was, at all relevant times, an adult individual residing in Bronx County, New York.

14.    Plaintiff Esteban Cuahquentzi ("Cuaquentzi") was, at all relevant times, an adult individual residing in Queens County, New York.

15.    Throughout the relevant time period, Plaintiffs performed work for Defendants at

their restaurants located at 41 Mercer Street, New York, New York 10013 (hereinafter the "Soho Location") and 313 Church Street, New York, New York 10013 (hereinafter the "Tribeca Location").

16.     Plaintiffs consent in writing to be parties to this action, pursuant to 29 U.S.C. § 216(b), and their consent forms are attached hereto.

**Defendants:**

17.     Antique Garage, Inc. is an active New York Corporation doing business as "Antique Garage," with its principal place of business located at 41 Mercer Street, New York, New York 10013.

18.     A. G. Tribeca, Inc. is an active New York Corporation doing business as "Antique Garage," with its principal place of business located at 313 Church St, New York, New York 10013.

19.     According to the New York State Department of State, Division of Corporations, Antique Garage, Inc. was registered on April 3, 2003.

20.     According to the New York State Department of State, Division of Corporations, Defendant Utku Cinel ("Cinel" or the "Individual Defendant") is the chief executive officer of Antique Garage, Inc.

21.     According to the New York State Department of State, Division of Corporations, A. G. Tribeca, Inc. was registered on November 1, 2016.

22.     According to the New York State Department of State, Division of Corporations, Defendant Cinel is the chief executive officer and registered agent for A. G. Tribeca, Inc.

23.     Antique Garage, Inc. and A. G. Tribeca, Inc. are hereinafter referred to as "Antique Garage" or the "Corporate Defendants."

24.     Upon information and belief, Defendant Cinel is a current owner, operator and manager of Antique Garage.

25.     Upon information and belief, Cinel's wife, Evrim Cinel ("E. Cinel"), frequently worked in the back offices of Defendants' restaurants and had certain responsibilities relating to payroll and handling merchant invoices during the relevant time period. Throughout the relevant time period, E. Cinel occasionally distributed checks to employees and called Defendants' employees into the back office if she had questions about tip sheets.

26.     The Corporate Defendants and the Individual Defendant are hereinafter collectively referred to as the "Defendants."

27.     The Individual Defendant maintained operational control over the Corporate Defendants and managed Antique Garage by determining the wages and compensation of employees, establishing employees' schedules, maintaining employee records, and through possessing the authority to hire and fire employees, including Plaintiffs. Plaintiffs observed Defendant Cinel in the Soho and Tribeca Locations on a near daily basis, where he managed and supervised employees and handled employee conflicts.

28.     All Defendants are jointly and severally liable for all FLSA and NYLL violations alleged by Plaintiffs and the collective and class members due to their operation as a single unified enterprise.

29.     The Individual Defendant participated in the day-to-day operations of the Corporate Defendants and acted intentionally in his direction and control of Plaintiffs and Defendants' other similarly situated employees, and is an "employer" pursuant to the FLSA, 29 U.S.C. § 203(d), 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and is jointly and severally liable with the Corporate Defendants.

30.     At all relevant times, Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

31.     At all relevant times, Defendants employed, and/or continue to jointly employ, Plaintiffs and each of the Collective Action members within the meaning of the FLSA.

32.     Upon information and belief, at all relevant times, the Corporate Defendants have had gross annual revenues in excess of $500,000.00.

33.     Due to the single and unified nature of Defendants' business, the Corporate Defendants functioned as a single integrated enterprise for purposes of the FLSA threshold requirements relating to interstate commerce and annual revenues, as well as joint and several liability for damages.

34.     Throughout the relevant time period, Defendant Cinel and the Corporate Defendants operated as an integrated enterprise, jointly employing Plaintiffs and the collective and class members.

35.     The Corporate Defendants are both restaurants in Manhattan, New York serving similar, if not identical, Mediterranean cuisine, are commonly owned, operated and managed by Defendant Cinel, who exercises financial control over the restaurants and frequently transfers employees between locations, and operate as a single enterprise, as indicated by Defendants' websites. As described in greater detail below, Defendants' restaurants are marketed jointly with similar menus and logos.

36.     At all relevant times, Plaintiffs, the opt-in plaintiffs, and the New York Class Members were employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

37.     According to the New York State Liquor Authority, during the relevant time period,

Defendant Cinel owned the liquor license of Antique Garage, Inc. and A. G. Tribeca, Inc. and is therefore "responsible for the activities of employees and patrons in all parts of the licensed premises" and is "required to maintain adequate books and records of all the transactions involving [his] licensed business. This includes records recording [his] employees…." (See State Liquor Authority, Retail Licensees Handbook).

38.    Defendants Antique Garage, Inc. and Cinel have been defendants in at least two (2) previous lawsuits relating to unpaid wages, such that they should have been aware that their pay practices were unlawful. *See Abelino, et al. v. Antique Garage, Inc. et al.* (S.D.N.Y., No. 12-cv-1732); *Lauro, et al. v. Antique Garage, Inc., et al.* (S.D.N.Y., No. 10-cv-7671).

39.    Upon information and belief, prior to the COVID-19 pandemic, Defendant Cinel was in constant contact with "Mirna," "Okan," "Orku," "Douglas," "Stephany," "Josh," "Brenda," and Defendants' other managers to ensure that the restaurants were operating in accordance with Cinel's standards and policies. After the restaurants reopened after a brief shutdown due to the pandemic, Defendant Cinel acted as the sole managerial authority of the Corporate Defendants and was responsible for overseeing employees, as Defendants did not employ on-site managers.

## FLSA COLLECTIVE ACTION ALLEGATIONS

40.    Pursuant to 29 U.S.C. §§ 206, 207 & 216(b), Plaintiffs bring their First and Second Causes of Action as a collective action under the FLSA on behalf of themselves and the following collective:

> All persons employed by Defendants at any time since May 27, 2018 and through the entry of judgment in this case (the "Collective Action Period") who worked as non-management restaurant employees at either location of Antique Garage (the "Collective Action Members").

41.    A collective action is appropriate in this circumstance because Plaintiffs and the

Collective Action Members are similarly situated, in that they were all subjected to Defendants'
illegal policies of failing to pay minimum wage for all hours worked and failing to pay overtime
premiums for work performed in excess of forty (40) hours each week. As a result of these policies,
Plaintiffs and the Collective Action Members did not receive the legally-required minimum wages
for all hours worked and overtime premium payments for all hours worked in excess of forty (40)
hours per week.

42.     Plaintiffs and the Collective Action Members have substantially similar job duties
and were paid pursuant to a similar, if not the same, payment structure.

## NEW YORK FED. R. CIV. P. 23 CLASS ACTION ALLEGATIONS

43.     Pursuant to the NYLL, Plaintiffs bring their Third through Eighth Causes of Action
under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following
class:

> All persons employed by Defendants at any time since October 11,
> 2014 and through the entry of judgment in this case (the "Class
> Period") who worked as non-management restaurant employees at
> either location of Antique Garage (the "Class Members").

44.     The Class Members are readily ascertainable. The number and identity of the Class
Members are determinable from the records of Defendants. For purposes of notice and other
purposes related to this action, their names and addresses are readily available from Defendants.
Notice can be provided by means permissible under Fed. R. Civ. P. 23.

45.     The Class Members are so numerous that joinder of all members is impracticable.

46.     Upon information and belief, there are in excess of forty (40) Class Members.

47.     The questions of law and fact common to the Class predominate over any questions
solely affecting the individual members of the Class. These common questions include, but are not
limited to:

a.  whether Defendants employed Plaintiffs and the Class Members within the meaning of the NYLL;

b.  whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiffs and the Class Members;

c.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members minimum wage for all hours worked;

d.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members for all hours that they worked;

e.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members overtime premiums for hours worked in excess of forty (40) hours per workweek;

f.  whether Defendants failed to pay Plaintiffs and the Class Members an extra hour of minimum wage when working shifts in excess of ten (10) hours and/or split shifts;

g.  whether Defendants failed and/or refused to pay Plaintiffs and the Class Members who were sent home within four (4) hours of reporting to work at least four (4) hours of wages, or the number of hours in their regularly scheduled shifts, whichever was less;

h.  whether Defendants failed to provide Plaintiffs and the Class Members with a proper statement of wages with every wage payment as required by the NYLL;

i.  whether Defendants failed to provide proper wage notice to Plaintiffs and the Class Members at the beginning of their employment and/or before a change in wage rate, as required by the NYLL;

j. whether Defendants' failure to properly pay Plaintiffs and the Class Members lacked a good faith basis; and

k. whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

48.     <u>Plaintiffs' claims are typical of the Class Members' claims</u>. Plaintiffs, like all Class Members, were employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs, like all Class Members, were, *inter alia*, paid less than the statutory minimum wage for all hours worked, were not paid overtime premium pay for hours worked over forty (40) hours in a given workweek, were not paid spread-of-hours premiums when working a shift of ten (10) or more hours and/or a split shift, were not paid wages of any kind for certain hours worked, including time spent attending mandatory staff meetings and time worked past the end of their scheduled shifts, were not paid call-in pay of four (4) hours, or the number of hours in their regularly scheduled shifts (whichever was less) when they were sent home from Antique Garage within four (4) hours of reporting for work, and did not receive proper wage statements and wage notices. If Defendants are liable to Plaintiffs for the claims enumerated in this Complaint, they are also liable to all Class Members.

49.     <u>Plaintiffs and their Counsel will fairly and adequately represent the Class</u>. There are no conflicts between Plaintiffs and the Class Members and Plaintiffs bring this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover their own damages.

50.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Class Members.

51.     <u>A class action is superior to other available methods for the fair and efficient</u>

adjudication of this litigation.

52.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.

53.     The individual members of the Class have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other current litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will arise in managing the class action.

**TIPPED SUBCLASS**

54.     Pursuant to the NYLL, Plaintiffs Montebon, Amaya and Palma bring their Ninth Cause of Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following subclass of the Class:

> All persons employed by Defendants at any time since October 11, 2014 and through the entry of judgment in this case (the "Class Period") who worked in tipped positions at either location of Antique Garage, including, without limitation, servers, bussers and bartenders (the "Tipped Subclass Members").

55.     The Tipped Subclass Members are readily ascertainable. The number and identity of the Tipped Subclass Members are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

56.     The Tipped Subclass Members are each so numerous that joinder of all members is impracticable.

57.     Upon information and belief, there are in excess of forty (40) Tipped Subclass Members.

58.     The questions of law and fact common to the Tipped Subclass Class predominate

over any questions solely affecting the individual members of the Tipped Subclass Class. These common questions include, but are not limited to:

a.  whether Defendants employed Plaintiffs Montebon, Amaya and Palma and the New York Tipped Subclass Members within the meaning of the NYLL;

b.  whether Defendants illegally retained gratuities left by customers and failed to pay all such gratuities to Plaintiffs Montebon, Amaya and Palma and the New York Tipped Subclass members;

c.  whether Defendants properly notified Plaintiffs Montebon, Amaya and Palma and the Tipped Subclass Members that they were taking the "tip credit" against the full minimum wage;

d.  whether Defendants' failure to properly pay Plaintiffs Montebon, Amaya and Palma and the Tipped Subclass Members lacked a good faith basis; and

e.  whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

59.  Plaintiffs Montebon, Amaya and Palma's claims are typical of the Tipped Subclass Members' claims. Plaintiffs Montebon, Amaya and Palma, like all Tipped Subclass Members, were employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs Montebon, Amaya and Palma, like all Tipped Subclass Members, were, *inter alia*, not notified of Defendants' reliance on the tip-credit to lower the minimum wage and were not paid all of the gratuities that they earned. If Defendants are liable to Plaintiffs Montebon, Amaya and Palma for the claims enumerated in this Complaint, they are also liable to all Tipped Subclass Members.

60.     Plaintiffs Montebon, Amaya and Palma and their Counsel will fairly and adequately represent the Tipped Subclass. There are no conflicts between Plaintiffs Montebon, Amaya and Palma and the Tipped Subclass Members, and Plaintiffs Montebon, Amaya and Palma bring this lawsuit out of a desire to help all Tipped Subclass Members, not merely out of a desire to recover their own damages.

61.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Tipped Subclass Members.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

63.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.

64.     The individual members of the Tipped Subclass have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other current litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will arise in managing the class action.

## STATEMENT OF FACTS

**Defendants' Restaurants**

65.     At all relevant times, Defendants have been in the food service business.

66.     Upon information and belief, Defendant Cinel has owned, operated and managed the Soho Location since in or around 2003. Upon information and belief, Defendant Cinel has owned, operated and managed the Tribeca Location since in or around late 2016.

67.     According to Defendants' website for the Soho Location, "[c]onverted from an old

mechanic shop in 2003 by Chef/Owner Utku Cinel, Antique Garage has maintained it's reputation as one of SoHo's best kept secrets for over a decade. Our menu embraces a diverse collection of cross-cultural influences spanning the Mediterranean with delicate flavors predominating. Our ingredients are responsibly sourced, fresh, organic and prepared with care. Utku's private collection of antiques offers an eclectic, unique and romantic ambiance, charming and elegant in the tradition of old New York." http://www.antiquegaragesoho.com/about.

68.    Defendants' website for the Soho Location contains a link to the website for the Tribeca Location. Similarly, Defendants' website for the Tribeca Location contains a link to the website for the Soho Location. Both websites feature nearly identical menus and layouts.

69.    Defendants' website for the Tribeca Location states, "After a long run, to be precise it's 14 years, we find a new place to open our doors to our valued guests right on Church St. Antique Garage now is open with its stylish dining room at TriBeCa. … All pieces in the dining room, including utensils, plates, tables, chandeliers and pictures even mirrors collected with a great amount of care. They are all Victorian era antique pieces and summing up the whole dining experience that we're aiming for." https://www.antiquegaragetribeca.com/about-2.

70.    The Soho Location and the Tribeca Location share similar interior décor featuring antique furniture and utensils, serve similar Mediterranean food, use similar menus and employ the same personnel who were instructed to work at different locations in accordance with Defendants' needs.

71.    Upon information and belief, during the relevant time period, the Soho Location operated seven (7) days per week, from 12:00 pm to 10:00 pm Monday through Thursday, from 11:00 am to between 11:00 pm and 11:30 pm on Fridays and Saturdays, and from 11:00 am to 10:00 pm on Sundays.

72.     Upon information and belief, the Tribeca Location currently operates seven (7) days per week, from 5:00 pm to 11:00 pm Sunday through Thursday and from 5:00 pm to 11:30 pm on Saturdays and Sundays.

73.     Both Antique Garage locations frequently serve customers beyond the listed closing times, depending on how busy they are and may serve guests until as late as 12:30 am.

74.     Both Antique Garage locations were closed for several months from in or around March 2020 through in or around June 2020 due to the COVID-19 health emergency.

75.     Upon information and belief, even after restaurants were required to close at 10:00 pm per New York State guidelines during the COVID-19 pandemic, starting in or around November 2020, Defendants continued to serve customers well past 10:00 pm such that Defendants' employees were unable to take a train home before the subway shut down for the night.

76.     At all relevant times, the Individual Defendant has been a frequent presence at both the Soho Location and the Tribeca Location, where he manages the operations of the restaurants and ensures that Defendants' businesses are run in accordance with his policies and procedures. Throughout the relevant time period, Plaintiffs observed Defendant Cinel at both locations on a near daily basis supervising and giving orders to employees and otherwise overseeing the operations of the restaurants. As described below, Defendant Cinel also frequently led staff meetings.

77.     Upon information and belief, Defendant Cinel additionally monitored footage from various cameras installed in the restaurant. For example, throughout the relevant time period, Defendant Cinel often called the employee assigned as "captain" for the shift (an employee selected by Cinel to open and/or close the restaurant and perform certain "lead server" duties such

as submitting employee hours and tip information to Cinel and/or other restaurant management) to instruct him or her to start sending employees home because it did not appear that the restaurant was busy.

78.     On numerous occasions, Defendant Cinel additionally instructed employees to bring Amazon packages and wine to his private residence or bring plates, glassware and candles from one Antique Garage location to the other.

79.     Upon information and belief, prior to March 2020, Defendant Cinel typically reviewed draft schedules prepared by managers and was able to make changes and give final approval. After the restaurants reopened following the shutdown, Defendant Cinel was primarily responsible for preparing employees' weekly schedules.

80.     Based on their observations of Defendants' restaurants, Plaintiffs are aware that if Defendant Cinel wanted to punish a particular employee, he would personally assign them only one (1) day of work for the week, schedule them to work at the Tribeca Location, which was less busy, or would put them "on call" instead of assigning them a guaranteed shift.

81.     Throughout the relevant time period, Defendant Cinel frequently informed Plaintiffs and Defendants' other restaurant employees that Antique Garage is a "fine dining restaurant" and accordingly set standards regarding employees' general appearance and dress code. For example, Cinel occasionally approached Plaintiff Montebon while he was serving as a "captain" and admonished him for "forgetting to tell staff" about Antique Garage's dress code if Cinel noticed that a staff member had not shaved or had worn a wrinkled shirt to work. Cinel would frequently cut the employee's shift the following week if he noticed that he or she was not dressed appropriately again.

82.     Upon information and belief, at all relevant times, the Individual Defendant has had

power over payroll and personnel decisions at Antique Garage, including the power to hire and fire employees, set their wages, retain time and/or wage records, and otherwise control the terms and conditions of their employment.

83.    During the relevant time period, Defendants experienced a particularly high turnover for managers (i.e., a new manager every six to 12 months) such that Defendant Cinel was often required to oversee employees and handle the overall business operations of the restaurants.

84.    Both the Soho and the Tribeca Locations were temporarily closed from approximately March 2020 through on or about June 11, 2020 due to the COVID-19 pandemic. After the restaurants reopened, Defendants did not employ on-site managers or supervisors at either location such that Defendant Cinel was present at the restaurants on a daily basis and was primarily responsible for supervising employees and overseeing the overall business operations of Antique Garage.

**Plaintiffs' Work for Defendants**

85.    **Plaintiff Montebon** was initially employed by Defendants as a server from in or around November 2016 through in or around summer 2018 and then as a bartender and server from winter 2019 through in or around October 2020, excepting a period from approximately mid-March 2020 through June 2020, when Defendants' restaurants were closed due to the COVID-19 global pandemic (the "Montebon Employment Period"). Specifically, Plaintiff Montebon worked for approximately two to three (2-3) weeks starting in or around the second week of June 2020, after Defendants' restaurants reopened. Subsequently, Montebon was not assigned additional shifts until Defendant Cinel called him back on or about September 16, 2020. Plaintiff Montebon continued working for Defendants from on or about September 16, 2020 until in or around the third week of October 2020, when, as described below, Montebon was placed "on call" indefinitely

and ultimately never called back to work for Defendants. Although Plaintiff Montebon's status as of the date of this complaint remains "on call," he has not been placed on the schedule or called to work for Defendants since October 2020 and has been removed from an employee group chat, such that he was effectively terminated.

86.     Starting in or around late 2017, Plaintiff Montebon worked for Defendants as a "captain" in addition to his regular server and bartender duties. As a captain, Montebon was responsible for opening and/or closing the restaurant, depending on which shift(s) he was assigned, collecting tip reports from employees and preparing a WhatsApp message to Defendant Cinel containing employee hours, the total tip amount earned by tipped employees and a status report for the night. With the exception of these additional tasks, Plaintiff Montebon primarily performed his regular server and/or bartending duties during his shifts.

87.     As mentioned above, during the relevant time period, Defendants experienced a particularly high turnover with their managers. Thus, Defendant Cinel gave Defendants' captains, including Montebon, the keys to open and close the restaurant.

88.     When Defendant Cinel assigned Montebon to work as a "captain," Montebon was responsible for opening and/or closing the restaurant, depending on the specific shifts to which he was assigned, and telling employees when they were permitted to end their shifts, per Defendant Cinel's explicit instructions.

89.     Plaintiff Montebon was initially hired by Defendant Cinel. At the start of the Montebon Employment Period, Cinel additionally told Montebon what his pay rate would be and gave him his schedule.

90.     From the start of the Montebon Employment Period to in or around February 2017, Plaintiff Montebon worked exclusively at the Soho Location. Starting in or around February 2017,

after the Tribeca Location opened, through in or around March 2020, Plaintiff Montebon performed work at both locations. When Plaintiff Montebon returned to work for approximately two to three (2-3) weeks in or around June 2020, he worked exclusively at the Soho Location. Subsequently, from on or about September 16, 2020 through the end of the Montebon Employment Period, Plaintiff Montebon worked exclusively at the Tribeca Location.

91.    When Montebon was required to open one of Defendants' restaurants, he typically arrived between 10:30 am and 11:00 am and would typically open the bar and ensure that it was sufficiently stocked and make sure that the various sections of the restaurant were ready for service. Defendant Cinel typically called Montebon to check whether everyone assigned to work that shift had arrived on time. After the restaurants reopened following the shutdown in or around June 2020, Montebon was additionally responsible for setting up outdoor tables and chairs, as the restaurant did not offer indoor dining at that time.

92.    After Defendants' restaurants reopened following the shutdown in or around June 2020, Plaintiff Montebon typically opened approximately three (3) days per week.

93.    After the restaurants reopened after the shutdown, Plaintiff Montebon was required to bring in tables and chairs from outside when he closed the restaurant in the evening.

94.    For a brief period at the start of the Montebon Employment Period and again when Montebon returned to work for Defendants as a bartender, Defendants considered Montebon to be in a "training" period. Plaintiff Montebon did not receive wages, including tips, of any kind during his "training" periods. In total, Montebon estimates that he was not paid wages of any kind, including tips, for approximately ten (10) days of "training."

95.    From the start of the Montebon Employment Period to in or around December 2016, Plaintiff Montebon typically worked approximately three to four (3-4) days per week, for a

total of approximately twenty-five to thirty (25-30) hours per week.

96.     From in or around February 2017 through in or around March 2020, Plaintiff Montebon typically worked five to six (5-6) days per week, from between approximately 4:00 pm through 11:30 pm, and sometimes as late as 1:00 am, for a total of approximately forty to fifty-two (40-52) hours per week. During this period, Plaintiff typically worked one (1) or two (2) days per week at the Tribeca Location and spent the rest of the week working at the Soho Location.

97.     After Plaintiff Montebon returned to work after the pandemic for two to three (2-3) weeks in or around June 2020 and again from on or about September 16, 2020 through in or around early October 2020, Plaintiff Montebon typically worked approximately five (5) dinner shifts per week, from approximately 4:00 pm to between 10:00 pm and 11:00 pm, and sometimes later, for a total of approximately thirty-five to thirty-seven (35-37) hours per week.

98.     As described in greater detail below, for approximately the last two (2) weeks of October 2020, Defendants reduced Montebon's schedule to three (3) weekdays per week and placed him "on call" for Friday and Saturday shifts, before placing him fully "on call" starting on or about October 26, 2020. Montebon has not worked for Defendants since on or about October 26, 2020.

99.     Plaintiff Montebon occasionally worked a double shift, starting at approximately 12:00 pm or 1:00 pm. When Plaintiff Montebon was required to open the restaurant to which he was assigned and work through the dinner shift, he was generally permitted to leave prior to the end of the dinner shift (i.e., typically between 8:00 pm and 10:00 pm).

100.    As a "captain," Plaintiff Montebon was frequently required to close the restaurant to which he was assigned at the end of the night. When Montebon closed, he typically stayed until between 12:00 am (midnight) and 1:00 am, and sometimes as late as 1:30 am, as he was required

to wait for all employees, including the dishwashers, who were typically the last to leave, to complete their job duties for the evening.

101.     Throughout the relevant time period, Defendant Cinel routinely instructed "captains" to only record employee hours in thirty (30)-minute increments, such that Montebon was routinely shorted approximately fifteen (15) minutes, and sometimes more, from his shift. On several occasions when Montebon worked as a captain and listed his end time as some time past the nearest half hour (e.g., 10:42 pm), he was only paid for time worked up to the nearest half hour (e.g., 10:30 pm). Upon information and belief, Defendant Cinel improperly rounded down the time that Plaintiff Montebon had recorded

102.

103.     When Plaintiff Montebon worked the dinner shift, from approximately 4:00 pm to closing, he was not permitted to take a break of any kind. When Plaintiff worked a double shift, from approximately 12:00 pm or 1:00 pm into the dinner shift, he was generally able to take a thirty (30)-minute break for meals.

104.     As mentioned above, for a brief period at the start of the Montebon Employment Period, Plaintiff Montebon was in a "training" phase and did not receive wages or tips of any kind. Subsequently, for approximately the first two to three (2-3) weeks that Montebon performed work as a server after his initial training period ended, Montebon received only his tips on a personal check with no wages of any kind for the specific hours that he worked. Montebon was entered into Defendants' payroll system and started receiving payroll checks only after speaking with a manager and specifically requesting to be paid "on the books."

105.     Throughout the Montebon Employment Period, Plaintiff Montebon was paid the New York City large employer tipped minimum wage. Thus, from the start of the Montebon

Employment Period to in or around December 2017, Plaintiff Montebon was paid seven dollars and fifty cents ($7.50) for all hours for which he received compensation, plus tips. From in or around January 2018 through in or around December 2018, Plaintiff Montebon was paid eight dollars and seventy cents ($8.70) for all hours for which he received compensation, plus tips. From in or around January 2019 through the end of the Montebon Employment Period, Plaintiff Montebon was paid ten dollars ($10.00) per hour for all hours for which he received compensation, plus tips.

106.    On several occasions throughout the Montebon Employment Period, Defendant Cinel instructed Montebon to return home within one to two (1-2) hours after reporting to work as he had overstaffed for the shift. On these occasions, Montebon was paid only for the hours that he actually worked and did not receive call-in pay of at least four (4) hours of wages, as required per the NYLL.

107.    Throughout the Montebon Employment Period, excepting his ten (10)-day training phase and the two to three (2-3)-week period at the start of the Montebon Employment Period during which Defendants issued Montebon a personal check only for his tip amounts, Plaintiff Montebon received his wages via payroll check. As described below, Montebon received separate payroll checks for each Antique Garage location at which he worked during each pay period.

108.    When Plaintiff Montebon performed work at both Antique Garage locations during a particular pay period, he typically received separate payroll checks for the hours that he worked at each location at straight time, such that he did not receive overtime premiums of one and one-half (1.5) times his hourly rate when his total hours worked for the week exceeded forty (40) hours. For example, if Montebon worked twenty-five (25) hours at the Soho Location and twenty-five (25) hours at the Tribeca Location, he would receive two (2) separate checks, one from Antique

Garage, Inc., and one from A. G. Tribeca, Inc., showing payment at his regular straight-time rate for all fifty (50) hours, despite the fact that he had worked well in excess of forty (40) hours for Defendants that week.

109.    During his employment with Defendants, Plaintiff Montebon was required to attend certain meetings with Defendant Cinel, Defendants' managers and other employees who worked as captains, which took place approximately every two (2) weeks, as well as general meetings with all employees that took place approximately two to four (2-4) times per year. On average, the general meetings with all employees took approximately one (1) hour, while the meetings with the managers and captains took approximately one to two (1-2) hours. Despite the fact that these meetings typically took place prior to the start of his scheduled shift or during his day off, Montebon was not permitted to clock in, such that he was not compensated for time spent attending mandatory meetings.

110.    Throughout the Montebon Employment Period, Plaintiff Montebon typically worked an average of seven (7) large holiday parties each year from in or around the last week of November through in or around the first couple of weeks of January. As described in greater detail below, Plaintiff Montebon was frequently not paid all gratuities to which he was entitled for the work that he performed at these events.

111.    At no point during his employment period did Montebon receive a written notice or any other notification that Defendants were taking the tip credit in calculating his hourly rate, nor did Defendants provide to Plaintiff Montebon a wage notice setting forth his hourly rate or the fact that Defendants were taking the tip credit.

112.    After Defendants' restaurants reopened following the shutdown in or around June 2020, Defendant Cinel informed Plaintiff Montebon and his coworkers on several occasions that

the restaurants had done well financially despite the COVID-19 pandemic. Specifically, Cinel stated that he did not even need to open the Tribeca Location if he did not want to, as he had already paid rent through the end of the year, and he had made a lot of money from the Soho Location.

**Defendants' Retaliation Against Plaintiff Montebon**

113.    Approximately one (1) week after he was called back to work in or around September 2020, Plaintiff Montebon had conversations with several of Defendants' tipped employees who stated that they felt they were not receiving all of their tips. Indeed, as described in greater detail below, shortly after returning back to work, Montebon additionally realized that the tip amounts that he received on his paychecks were well below the total tip amounts earned during his shifts.

114.    On or about October 8, 2020, Plaintiff Montebon asked Defendant Cinel for a breakdown of how much he earned in tips per day, as he had had conversations with other of Defendants' tipped employees who stated that they felt they were not receiving all of their tips. Defendant Cinel responded by asking Montebon why he didn't "get it" and informed Montebon that he received a weekly paycheck. Montebon pointed out that the paystub that he received was issued on a weekly basis, and reiterated that he was trying to find out how much he made in tips per day. Cinel stated that it would be "too much work" to provide tipped personnel with the amount in tips they earned each day. Montebon stated that he did not necessarily need a report each day, but would be willing to receive a report summarizing how much he earned each day in tips at the end of the week. Cinel became angry and demanded to know whether someone had been complaining that he was stealing tips, despite the fact that Montebon had not made these accusations.

115.    In response to Montebon's inquiries about tips, Cinel promptly placed Montebon "on call" that weekend, depriving him access to the most lucrative shifts, and reduced his hours for the week starting October 11, 2020. Despite the fact that Montebon had previously worked at least five (5) days per week for the majority of his employment with Defendants, including at least one (1) weekend day, after he inquired about his tips, Defendants assigned him to work only three (3) weekdays and placed him "on call" for Friday and Saturday shifts, before placing him fully "on call" starting on or about October 26, 2020. Montebon has not worked for Defendants since on or about October 26, 2020.

116.    **Plaintiff Amaya** worked for Defendants as a server and bartender from in or around March 2018 through in or around October 2020, excepting a period from approximately mid-March 2020 through June 2020, when Defendants' restaurants were closed due to the COVID-19 pandemic (the "Amaya Employment Period"). After approximately three (3) weeks of being "on call" starting in or around October 2020, Plaintiff Amaya was removed from the employee WhatsApp group chat and was never called back to work for Defendants.

117.    Starting in or around June 2020, Plaintiff Amaya worked for Defendants as a "captain" in addition to her regular server and bartender duties. As a captain, Amaya was responsible for opening and/or closing the restaurant, depending on which shift(s) she was assigned, collecting tip reports from employees and preparing a WhatsApp message to Defendant Cinel containing employee hours, the total tip amount earned by tipped employees and a status report for the night. On average, Amaya closed one of Defendants' restaurants approximately two (2) times per week after she became a captain. With the exception of these additional tasks, Plaintiff Amaya primarily performed her regular server and/or bartending duties during her shifts

118.    Throughout the Amaya Employment Period, Plaintiff Amaya worked at both the

Soho and the Tribeca Locations.

119.    For approximately the first two (2) weeks of the Amaya Employment Period, Defendants considered Plaintiff Amaya to be in a "training" period. Despite the fact that she worked approximately thirty (30) hours each week during her training phase, Plaintiff Amaya was not paid wages of any kind, including tips, for the work that she performed while training.

120.    Subsequently, Plaintiff Amaya typically worked a mix of dinner and double shifts five to six (5-6) days per week. When Amaya worked a dinner shift, she typically worked from approximately 4:00 pm to 11:30 pm or 12:00 am, and sometimes as late as 12:30 am. When Amaya was required to work a double shift, which she was assigned up to three (3) days per week, she typically worked from 11:00 am to between 11:00 pm and 12:00 am, and sometimes as late as 12:30 am. In total, Plaintiff Amaya typically worked approximately forty to forty-three (40-43) hours per week, and up to fifty to fifty-five (50-55) hours per week during the summer months and the holiday season (i.e., from approximately late November through early January), when Defendants hosted numerous private events. Throughout the Amaya Employment Period, Plaintiff Amaya worked approximately eight to ten (8-10) holiday parties per year.

121.    When Amaya returned to work after the shutdown in or around June 2020, she primarily worked at the Soho Location. From June 2020 through the end of the Amaya Employment Period, Plaintiff Amaya typically worked approximately thirty-two to forty-four (32-44) hours per week.

122.    When Amaya closed the restaurant, she was required to stay until all customers and employees, including the dishwashers, left for the night.

123.    When Amaya worked as a captain, starting in or around June 2020, Defendant Cinel instructed her to record the time that she clocked out of Defendants' Micros system in order to

access and print the tip report as her end time for her shift, as opposed to the time that she actually left. Thus, although Amaya frequently had to remain at the restaurant for an additional sixty to ninety (60-90) minutes waiting for the kitchen employees to finish their duties so that she could close the restaurant, she was often not compensated for this time.

124.    Throughout the relevant time period, Defendant Cinel instructed "captains" to only record employee hours in thirty (30)-minute increments, such that Amaya was routinely shorted an additional fifteen to thirty (15-30) minutes from her shift. On several occasions when Amaya worked as a captain and listed her end time as some time past the nearest half hour (e.g., 10:42 pm), she was only paid for time worked up to the nearest half hour (e.g., 10:30 pm). Upon information and belief, Defendant Cinel improperly rounded down the time that Plaintiff Amaya had recorded. .

125.    Throughout the Amaya Employment Period, Plaintiff Amaya was typically able to take a thirty (30)-minute break when she worked a double shift. However, she was occasionally unable to take a break lasting more than fifteen (15) minutes during a double shift if the restaurant was particularly busy. Amaya was generally unable to take a break of any kind when she worked a single shift.

126.    Throughout the Amaya Employment Period, Plaintiff Amaya was paid the New York City large employer tipped minimum wage. Thus, from the start of the Amaya Employment Period to in or around December 2018, Plaintiff Amaya was paid eight dollars and seventy cents ($8.70) for all hours for which she received compensation, plus tips. From in or around January 2019 through the end of the Amaya Employment Period, Plaintiff Amaya was paid ten dollars ($10.00) per hour for all hours for which he received compensation, plus tips.

127.    When Plaintiff Amaya performed work at both Antique Garage locations during a

particular pay period, she typically received separate payroll checks for the hours that she worked at each location at straight time, such that she did not receive overtime premiums of one and one-half (1.5) times her regular hourly rate when her total hours worked for the week exceeded forty (40) hours.

128.    Throughout the Amaya Employment Period, Plaintiff Amaya received her wages via payroll check. As described above, Amaya received separate payroll checks for each Antique Garage location at which he worked during each pay period.

129.    On several occasions throughout the Amaya Employment Period, Defendant Cinel instructed Amaya to return home within thirty to sixty (30-60) minutes after she reported to work. On these occasions, Amaya was paid only for the time that she actually worked before being sent home and did not receive call-in pay of at least four (4) hours of wages, as required per the NYLL.

130.    Throughout the Amaya Employment Period, Plaintiff Amaya was required to attend meetings every two to four (2-4) weeks during the busier summer and holiday seasons concerning a variety of topics, including instructions for managing events. For example, if Defendants were hosting an event at one of their restaurants that week, Cinel would provide information about the size of the party and instruct captains to provide reports on containing certain relevant information about the event. On average, these meetings typically lasted approximately one to two (1-2) hours and often took place either a couple of hours prior to her scheduled shift time (e.g., 2:00 pm before a 4:00 pm dinner shift) or on her day off. Amaya was typically instructed not to clock in and out when she attended these meetings and was, thus, never compensated for this time.

131.    On one occasion shortly before the end of the Amaya Employment Period, when Defendant Cinel was dining at the Soho Location with friends, Defendant Cinel grabbed Plaintiff

Amaya's arm as she walked by and yelled at her publicly because she chose to pour wine for other customers instead of serving him and his friends first. Amaya explained that she was busy performing her job duties and serving other customers, to which Defendant Cinel responded that that was "no excuse," as he was the priority, and he expected her to take care of him before anyone else in the restaurant. Defendant Cinel then asked Amaya if she was available to close the restaurant. Amaya declined, as she was working a double shift that day and was scheduled to open the restaurant the following day. Defendant Cinel again became angry and yelled at Amaya to "get the [expletive] out of here, the door is right there." Cinel subsequently placed Amaya "on call" for the upcoming workweek, with no guaranteed shifts. The following Friday, Defendant Cinel called Amaya and asked her to report to work for a dinner shift with one (1) hour's notice. When Amaya declined, Cinel placed her on call for approximately three (3) weeks, during which she was never called to work, and removed her from the employee group chat, effectively terminating her.

132. **Plaintiff Palma** has worked for Defendants as a busser, server and bartender from in or around November 2014 through the present, excepting a period from approximately mid-March 2020 through June 2020, when Defendants' restaurants were closed due to the COVID-19 pandemic (the "Palma Employment Period"). For approximately the first one and one-half (1.5) years of the Palma Employment Period, Plaintiff Palma worked as a busser until Defendant Cinel gave him permission to begin working as a server and bartender. For the majority of the Palma Employment Period, Plaintiff Palma primarily performed bartending duties. Since Defendants' restaurants reopened after the shutdown in or around June 2020, Plaintiff Palma has been working as a bartender, busser and server.

133. Throughout the Palma Employment Period, Plaintiff Palma worked at both the Soho and the Tribeca Locations. In general, Plaintiff Palma worked roughly similar amounts of

time at each location each week.

134.    During the Palma Employment Period, Defendant Cinel additionally assigned Palma to work as a "captain" as various managers quit in addition to his regular server, bartender and busser duties. As a captain, Plaintiff Palma was required to open and close the restaurants and perform various customer service duties (e.g., speaking with customers who were not satisfied with a dish). Palma was also responsible for gathering server reports to complete an employee tip sheet in Excel, preparing a WhatsApp message containing employee hours and a status report for the night and distributing tips to employees. As mentioned below, after the restaurants reopened after the shutdown, in lieu of the Excel tip sheet, Palma was required to send a WhatsApp message to Cinel containing the names of employees who had worked during the shift, the total tip amount collected, whether there were any customer complaints or mistakes in orders and whether any employees arrived late for their shift.

135.    On several occasions, when an employee arrived five to ten (5-10) minutes late, Defendant Cinel instructed Palma to deduct a full thirty (30) minutes from the employee's recorded time for the day, even if the employee started work immediately upon arrival at the restaurant.

136.    From the start of the Palma Employment Period to in or around March 2020, Plaintiff Palma typically worked six (6) days per week, from approximately 4:00 pm to between 11:00 pm and 12:00 am, and often as late as 1:00 am on weekends, for a total of approximately forty-two to fifty (42-50) hours per week. During this period, Plaintiff Palma typically worked a double shift, from approximately 12:00 pm through the dinner shift, three to four (3-4) times per year.

137.    From in or around July 2020, when Palma returned to work for Defendants after the shutdown, through the present, Plaintiff Palma has worked two to four (3-4) days per week,

from approximately 12:00 pm to 10:00 pm, for a total of approximately twenty to forty (20-40) hours per week, and sometimes more.

138.    Throughout the Palma Employment Period, Plaintiff Palma was only permitted to take an uninterrupted thirty (30)-minute break if he worked a double shift.

139.    As a captain, Plaintiff Palma was frequently required to open and/or close the restaurant during the shift to which he was assigned. When Plaintiff Palma closed the restaurant, he was required to remain on the premises until the dishwasher had completed all assigned duties for the evening, including cleaning and taking out the garbage. However, Defendant Cinel directly instructed Plaintiff Palma not to include additional time he spent waiting for the dishwasher to finish in his report such that Plaintiff Palma frequently wrote down his end time as the time that the last server left the restaurant at the end of the shift. Thus, although Plaintiff Palma frequently stayed at the restaurant an additional thirty to sixty (30-60) minutes, and sometimes more, waiting for the dishwasher to finish his job duties and often used this time to complete the time and status reports that he was required to submit to Defendant Cinel, he was not compensated for this time.

140.    Throughout the Palma Employment Period, Plaintiff Palma was paid the New York City large employer tipped minimum wage. Thus, from the start of the Palma Employment Period to in or around December 2017, Plaintiff Palma was paid seven dollars and fifty cents ($7.50) for all hours for which he received compensation, plus tips. From in or around January 2018 through in or around December 2018, Plaintiff Palma was paid eight dollars and seventy cents ($8.70) for all hours for which he received compensation, plus tips. From in or around January 2019 through the present, Plaintiff Palma has received ten dollars ($10.00) per hour for all hours for which he received compensation, plus tips.

141.    Approximately every other month, Defendant Cinel required Plaintiff Palma to take

inventory of wine and liquor bottles in Defendants' restaurants and order additional alcohol outside of his scheduled hours, which took approximately two to three (2-3) hours at each location. When this occurred, Defendants would pay Plaintiff Palma an additional one hundred dollars to one hundred and eighty dollars ($100.00-$180.00).

142.    During his employment with Defendants, Plaintiff Palma was required to attend certain meetings with Defendant Cinel, Defendants' managers and other employees who worked as captains, which took place approximately every two (2) weeks, as well as general meetings with all employees that took place approximately twice per year. On average, the general meetings with all employees took approximately sixty to ninety (60-90) minutes, while the meetings with the managers and captains took approximately sixty (60) minutes. Despite the fact that these meetings typically took place prior to the start of his scheduled shift, Palma was not permitted to clock in, such that he was not compensated for time spent attending mandatory meetings.

143.    When Plaintiff Palma performed work at both Antique Garage locations during a particular pay period, he typically received separate payroll checks for the hours that he worked at each location at straight time, such that he did not receive overtime premiums of one and one-half (1.5) times his hourly rate when his total hours worked for the week exceeded forty (40) hours. At no point during the Palma Employment Period did Plaintiff Palma receive one and one-half (1.5) times his regular hourly rate for hours worked in excess of forty (40).

144.    Throughout the Palma Employment Period, Plaintiff Palma received his wages via payroll check. As described above, Palma received separate payroll checks for each Antique Garage location at which he worked during the pay period. From the start of the Palma Employment Period to in or around 2018 or 2019, Plaintiff Palma was required to pick up his checks from the restaurant on a weekly basis. Starting in or around 2018 or 2019, Plaintiff Palma

received his wages via direct deposit.

145.    In or around April 2017, Defendants required Plaintiff Palma to take a food protection and safety class issued by the New York City Department of Health and Mental Hygiene, which consisted of three (3) two (2)-hour classes that took place prior to the start of Palma's scheduled shift. Palma was never compensated for this time.

146.    **Plaintiff Cuahquentzi** worked for Defendants as a dishwasher from approximately September 2017 through in or around December 2020, excepting a period from approximately March 2020 through September or October 2020 when Cuahquentzi was not called into work due to the COVID-19 pandemic (hereinafter the "Cuahquentzi Employment Period").

147.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi's job duties included cleaning the grill, changing the oil in the kitchen stove, fixing and cleaning the stove and the kitchen generally, taking out the garbage and cleaning the floors. During the last few months of the Cuahquentzi Employment Period, Defendant Cinel additionally instructed Cuahquentzi to perform line cook duties.

148.    On certain occasions, Defendant Cinel gave specific instructions to Cuahquentzi on how to perform his job duties (e.g., instructing Cuahquentzi, a dishwasher, to help the line cooks because they needed assistance during busy shifts).

149.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi performed work at both the Soho and Tribeca Locations. Although Defendant Cinel occasionally sent Cuahquentzi to both locations in one day if there was an emergency or a no-show employee, Cinel specifically informed Cuahquentzi that employees needed to be rotated between both locations as he did not want workers accumulating overtime hours at one location.

150.    When Plaintiff Cuahquentzi returned to work after the shutdown in or around

September or October 2020, he worked exclusively at the Tribeca Location.

151.    From the start of the Cuahquentzi Employment Period to in or around March 2020, Plaintiff Cuahquentzi typically worked four to six (4-6) days per week. When Cuahquentzi worked at the Tribeca Location, he typically worked from between approximately 1:00 pm and 3:00 pm until approximately 12:00 am. When Cuahquentzi worked at the Soho Location, he typically worked from approximately 7:00 am to 3:00 pm on Sundays and from approximately 12:00 pm to 1:00 am on Tuesdays and Thursdays. In total, Plaintiff Cuahquentzi typically worked approximately fifteen to twenty (15-20) hours per week at the Tribeca Location and approximately twenty-five to thirty (25-30) hours per week at the Soho Location.

152.    When Cuahquentzi returned to work after the shutdown in or around September or October 2020 through the end of the Cuahquentzi Employment Period, Plaintiff Cuahquentzi typically worked five (5) days per week, for a total of approximately thirty to thirty-five (30-35) hours per week.

153.    After Defendants' restaurants closed for customers, Plaintiff Cuahquentzi was required to stay behind to clean all of the dishes, take out the garbage, wash the dishes in the bar area, clean the carpets and wash the floor. Specifically, Plaintiff Cuahquentzi would often stay until between approximately 12:30 am and 1:00 am to complete these duties.

154.    On average several times per week, Defendant Cinel urged Cuahquentzi to work faster, stating that if he "was doing this [i.e., working late to complete his assigned job duties] for the overtime, he needed to stop," despite the fact that Cuahquentzi often explained to Cinel that he could not leave dirty dishes behind for the next shift. On at least one (1) occasion in or around mid-2019, Cinel explicitly informed Cuahquentzi that he "didn't want to pay overtime."

155.    Indeed, if Cuahquentzi left his shift before fully completing his job duties, Cinel

would reprimand him shortly thereafter either in person or on the WhatsApp group chat. For example, approximately fifteen (15) days prior to the end of the Cuahquentzi Employment Period, Defendant Cinel sent Plaintiff Cuahquentzi and the other kitchen employees a photo of the restaurant's grill via WhatsApp, asking "why did you guys not clean this?" Plaintiff Cuahquentzi responded by asking Defendant Cinel why he had waited until several days after his shift to complain when Cuahquentzi had only left his shift earlier to accommodate Cinel's frequent complaints about his late working hours. Subsequently, Defendant Cinel assigned Cuahquentzi only two (2) days of work. The following week, Cinel informed Cuahquentzi that he needed to rework the schedule and failed to assign him any shifts. Cuahquentzi was never added back onto the schedule.

156.    On at least several occasions, various employees assigned to the "captain" role, including Plaintiff Palma, urged Cuahquentzi to hurry up and finish his job duties for the night, as Defendants did not pay the captains for all of the time that they spent waiting for the dishwasher to finish at the end of the night in order to close the restaurant.

157.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was frequently unable to take a break of any kind during his workday unless his shift was particularly slow. As a result, Plaintiff Cuahquentzi typically brought his own food from home and ate quickly while dishwashing and performing other tasks. Despite the fact that Cuahquentzi rarely took an uninterrupted break, if Defendant Cinel observed Cuahquentzi eating, he would often get angry and accuse Cuahquentzi of spending his entire shift eating. At most, Cuahquentzi was able to take a fifteen to twenty (15-20) minute break during his shift.

158.    Through the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was paid the New York City large employer minimum wage rate for all regular hours for which he received

compensation. Thus, from the start of the Cuahquentzi Employment Period through in or around 2018, Plaintiff Cuahquentzi was paid eleven dollars ($11.00) per hour. From in or around 2018 through in or around 2019, Plaintiff Cuahquentzi was paid thirteen dollars ($13.00) per hour. From in or around 2019 through the end of the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was paid fifteen dollars ($15.00) per hour.

159.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi sent a summary of his hours for the week to Defendant Cinel on Mondays through a WhatsApp group chat. Cinel would typically send a message in the group chat each week asking employees for their hours. Cuahquentzi and Defendants' other kitchen employees would then type out their hours and send them in a message to the group chat or send a photograph of handwritten personal records of the hours that they worked the previous week. Defendant Cinel also typically sent kitchen workers a photo of the employee schedule through the WhatsApp group chat each week.

160.    Throughout the Cuahquentzi Employment Period, Defendants frequently failed to pay Cuahquentzi wages of any kind for certain time spent working in excess of his scheduled shift to finish cleaning the kitchen or washing dishes. Upon information and belief, Defendants paid only to the nearest half hour such that Cuahquentzi was often not paid for approximately fifteen to thirty (15-30) minutes per shift.

161.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was paid via corporate check with no breakdown of the specific number of hours for which he was being compensated or his regular or overtime rates. Upon information and belief, the checks that Cuahquentzi received came from A. G. Tribeca, Inc., despite the fact that Cuahquentzi routinely worked at both the Soho and Tribeca Locations.

162.    Throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was

required to attend meetings with the kitchen staff at the Soho Location led by Defendant Cinel and a manager of Peruvian descent whose name Cuahquentzi cannot recall, who translated Cinel's speech for Spanish-speaking employees. These meetings took place approximately every two to three (2-3) months or as deemed necessary by Defendant Cinel (i.e., if there was a serious customer complaint that needed to be addressed) and concerned topics such as business status and performance, menu changes, how Cinel wanted specific dishes to be served, kitchen maintenance and customer complaints about how dishes were prepared. When Cuahquentzi was required to attend these meetings, he typically arrived at the restaurant at approximately 9:00 am. Meetings typically lasted between approximately thirty (30) and sixty (60) minutes. After the meetings, Cuahquentzi went home and returned to work later that afternoon for his regular shift. Plaintiff Cuahquentzi was not compensated for time spent attending mandatory meetings.

163.    On at least two (2) occasions, Defendant Cinel instructed Plaintiff Cuahquentzi to return home very shortly after he returned to work because the restaurant was sufficiently staffed for the shift. Plaintiff Cuahquentzi did not receive call-in pay of at least four (4) hours for these days, in violation of the NYLL.

164.    As mentioned above, throughout the Cuahquentzi Employment Period, Plaintiff Cuahquentzi was part of a WhatsApp group chat in which Defendant Cinel sent messages to Cuahquentzi and Defendants' other kitchen employees, including reminders to clean the grills and floors and instructions about supplies that were being ordered or delivered.

165.    During the Cuahquentzi Employment Period, Plaintiff Cuahquentzi recorded his time in and out by entering a PIN code into the restaurants' P.O.S. system. At various times throughout the Cuahquentzi Employment Period, Cuahquentzi was able to print a sheet of paper containing his clock-in and clock-out times from the P.O.S. system. As mentioned above,

Cuahquentzi typically sent certain information about the hours that he worked to Defendant Cinel on a weekly basis through WhatsApp.

166.    On one (1) occasion in or around early 2019, Plaintiff Cuahquentzi mentioned to Defendant Cinel that he was missing an hour from his payment. Defendant Cinel responded by accusing Cuahquentzi of leaving one of his shifts earlier than he had. During this conversation, Plaintiff Cuahquentzi showed Cinel a printout from the machine that showed when he had clocked out during the shift in question. Defendant Cinel demanded to know how Cuahquentzi had extracted that information from the machine. Shortly after this conversation, Cuahquentzi was no longer able to access the option to print the time records from Defendants' P.O.S. system. Upon information and belief, Defendant Cinel blocked that feature in direct response to his conversation with Cuahquentzi in order to avoid complaints from employees about missing hours.

**Defendants' Timekeeping Practices**

167.    Throughout the relevant time period, Defendant Cinel or one of Defendants' managers typically sent the weekly work schedule to employees through a WhatsApp group chat. As mentioned above, Defendant Cinel was responsible for creating and/or approving the schedule and had the ability to make changes to the proposed schedule at any given time.

168.    Indeed, Defendant Cinel additionally texted employees directly about scheduling issues. On October 12, 2020, Cinel texted Plaintiff Cuahquentzi to inform him that he had terminated another employee, "Eduardo" and needed Cuahquentzi to work on Saturdays, stating that if Cuahquentzi could not, Cinel would have to hire someone else and reduce Cuahquentzi's schedule.

169.    Although Defendants maintained a Micros point-of-sale ("P.O.S.") system at both restaurant locations, upon information and belief, the P.O.S. system functioned primarily as an

attendance clock such that Defendants did not use the information that front-of-the-house employees entered into the system for payroll purposes. Instead, throughout the relevant time period, the employee designated as the "captain" for the shift would generally log the hours that front-of-the-house employees had worked, per Cinel's specific instructions, and submit that information to Cinel via an Excel spreadsheet and/or WhatsApp. Throughout the relevant time period, Defendant Cinel routinely instructed "captains" to only record employee hours in thirty (30)-minute increments, such that employees were routinely shorted time worked beyond their scheduled shifts.

170. As mentioned above, during the relevant time period, Defendant Cinel instructed captains to record the time that they clocked out of Defendants' Micros system to access and print the tip report as their end time (down to the nearest half hour), as opposed to the time that they actually left, resulting in substantial unpaid hours for time spent waiting for the kitchen employees to finish their duties so that the captains could close the restaurant.

171. Throughout the relevant time period, Defendants' servers typically logged into the Micros system when they were assigned their first table (i.e., instead of when they actually arrived for their shift) and logged off when they needed to print their sales reports at the end of the night, despite the fact that they often needed to stay later to retrieve their tips.

172. Upon information and belief, certain employees, including bussers and hosts, did not have access to the Micros system.

173. Due to relatively high turnover rates at Defendants' restaurants, certain employees would occasionally not be entered into the P.O.S. system at all such that it would have been impossible for them to use the Micros system for timekeeping purposes.

174. From the start of the relevant time period to in or around March 2020, the employee

designated by Cinel as the "captain" for the shift used a company iPad to fill in the start and end times and total tips earned by front-of-the-house employees into a Microsoft Excel template titled "Antique Garage Tips Outlook," which contained a list of Defendants' employees and the positions that they worked. Once the captain entered certain information, including employees' start and end times and the total tips earned per shift, the spreadsheet automatically generated the "total tip points" each employee had earned during the shift, as well as the total tip amount to which each employee was entitled from the pool per pre-entered formulas set by Defendants. The captain then sent this spreadsheet via e-mail to Defendant Cinel, E. Cinel, and various managers using the restaurants' general contact e-mail address (i.e., info@antiquegarage.com).

175.    In addition to the Excel spreadsheet, the employee designated as the "captain" for the shift typically logged the hours that employees had worked and sent a WhatsApp message to Defendant Cinel containing each employees' start and end times, which they had recorded to the nearest half hour per Cinel's instructions. This message might also include additional information such as the number of customers served during the shift, the number of reservations made and general comments regarding customer satisfaction or any issues that had arisen during the shift.

176.    After Defendants' restaurants reopened following the shutdown in or around June 2020, employees selected to work as "captains" no longer prepared or circulated the Excel spreadsheet regarding employees' tips, as Defendant Cinel had taken full responsibility for calculating and distributing gratuities among tipped employees. Thus, starting in or around June 2020, captains simply sent a summary of front-of-the-house employees' hours to Defendant Cinel via WhatsApp.

177.    Throughout the relevant time period, the employee designated as the "captain" for a particular shift kept track of front-of-the-house employees' start times by recording when each

employee scheduled to work that shift came in. As mentioned above, Cinel issued instructions to the captains during the shift as to when to send a specific employee home. When this happened, captains noted the time at which he or she dismissed a particular worker. Captains were generally not permitted to send employees home without Cinel's explicit approval.

178.    Throughout the relevant time period, Defendants' kitchen employees were able to clock in and out by entering a PIN code into the restaurants' P.O.S. system. As mentioned above, while back-of-the-house employees were able to print a sheet of paper containing their logged hours from the P.O.S. system, this feature was disabled in or around 2019.

179.    As mentioned above, throughout the relevant time period, Plaintiffs and Defendants' other employees were required to attend certain meetings that took place either prior to their scheduled shifts or on their days off. Throughout the relevant time period, Defendants routinely instructed their employees not to clock in prior to the start of these meetings such that Defendants' employees were not paid wages of any kind for their time spent attending mandatory staff meetings.

**Unlawfully Withheld Gratuities**

180.    Throughout the relevant time period, Defendants' tipped personnel participated in a tip pool through which each tipped employee earned a certain number of "points" per hour worked depending on his or her position. For example, a server received approximately two (2) points per hour, a runner received approximately 1.75 points per hour, a busser received approximately 1.25 points per hour and hosts and hostesses received approximately 0.8 points per hour. The employee Defendant Cinel chose to work as the captain was issued approximately 2.2 points per hour from the pool.

181.    Prior to March 2020, Defendants' managers were primarily responsible for

distributing tips amongst front-of-the-house employees.

182.    From the start of the relevant time period to in or around March 2020, servers provided tip reports to the "captain" at the end of the shift. The captain then added up all of the tips based on the reports and, as mentioned above, entered the total tip amount into an Excel template, which generated the total tip amount that each employee received based on the number of "points" he or she had earned during the shift. Thus, prior to in or around March 2020, Defendants' tipped employees were able to see how much they earned in tips each day.

183.    During the relevant time period, employees listed as "trainees" were not included in the tip pool and were not allocated any "points" per the Excel tips spreadsheet.

184.    From approximately the last week of November through in or around the first week of January of each year, Defendants hosted numerous holiday parties and private events. Upon information and belief, Defendant Cinel kept substantial portion of customers' tips from these events for himself instead of distributing them to the servers and other front-of-the-house employees who had worked the events. For example, on several occasions, Plaintiff Montebon worked events for which a customer had contracted with Defendants to serve a certain number of guests (e.g., 100 people). If, by way of example, only eighty (80) people showed up, Defendant Cinel would inform the tipped employees who had worked at the event that he was not able to pay the full tip amount that they were owed because the restaurant had not served as many guests as they had anticipated. Thus, Defendant Cinel would improperly reduce the total tips allocated to Defendants' tipped personnel based on the actual number of guests that had showed up to the party. Plaintiffs are aware of this because, as mentioned above, captains were required to prepare a tip chart based on the number of hours that each employee worked. Once they received their payments, the captains of the shifts during which the event took place frequently noticed that they

did not receive the full tip amount calculated for the hours that they worked at the event, as generated by the Excel tip chart.

185.    Plaintiffs are further aware that they were not paid all of the tips that they earned, as they were frequently able to see the total amount that a customer had paid for a particular event at the end of the night. Thus, as an example, if a customer had given two thousand dollars ($2,000.00) in tips, Defendant Cinel might give approximately two hundred dollars ($200.00) apiece to the six (6) tipped employees who had staffed the event.

186.    Plaintiff Palma recalls that during certain meetings he was required to attend as captain, Defendant Cinel informed staff that a percentage of tips from private events went to a "party representative," whom Cinel had assigned to serve as a contact person regarding the event. Upon information and belief, the party representative was responsible for answering phone and e-mail inquiries regarding party room packages and coordinating with customers regarding menu options and pricing for private events. The "party representative" position was seasonal and typically only staffed during the winter holidays. Although Defendant Cinel occasionally hired someone outside of the company to serve this role, the duties of the "party representative" were occasionally designated to the sitting floor manager or office manager, including "Kayla" and "Brenda."

187.    On one (1) occasion, in or around June 2018, Defendants hosted a wedding for a former hostess at the Tribeca Location. Although the bride left a substantial tip of several thousand dollars for Defendants' tipped employees, Defendant Cinel retained approximately one-half of the tip amount, claiming that he had spent a lot of money to host the wedding and needed to put a portion of the tips toward the expenses. Plaintiff Amaya was similarly informed by a manager, "Douglas," that Defendants needed to pay expenses and that she would get the rest of her tips the

following week once the customers had finished paying for the event. Amaya then followed up with an office manager, "Brenda," who told her that she was not entitled to any additional tip money and that she had allegedly already been paid for the event.

188.    After the restaurants reopened following the shutdown without on-site managers or supervisors, Cinel became solely responsible for calculating tip amounts and distributing gratuities to tipped personnel. Thus, starting in or around June 2020, Defendants' tipped employees either sent tip reports directly to Defendant Cinel so that he could determine how to allocate them to tipped personnel or gave the reports to the "captain" assigned to the shift so that he or she could send the total tip amount to Cinel. After June 2020, captains no longer filled out Excel tip sheets that generated the amount that each employee was meant to receive in tips each shift per the "points" system.

189.    Once Cinel began distributing tips, Plaintiffs Montebon, Amaya and Palma and Defendants' other front-of-the-house employees noticed on a routine basis that the amounts that Cinel distributed did not match the total tip amounts that customers had left during the relevant pay period. For example, during weeks that the captain was able to gather records of employees' tips to send to Cinel, they subsequently asked the employees who had worked the corresponding shifts how much they had been paid in tips for that week. From these discussions with coworkers, Plaintiffs learned that the amounts paid out to tipped employees were far below the total tip amount Plaintiffs had collectively earned. In general, there was between approximately one thousand dollars and two thousand dollars ($1,000.00-$2,000.00) missing from the total tip amount left by customers during the weeks that Plaintiffs and Defendants' other employees monitored the tip distributions.

190.    Specifically, in or around August 2020, Plaintiffs Amaya and Palma, who had

worked as captains, asked approximately nine (9) employees who had worked with them during certain shifts to see their paystubs for a couple of weeks. After totaling the tip amounts on the employees' paystubs and comparing it to the total tip amounts calculated at the end of each shift, Plaintiffs determined that approximately one thousand one hundred dollars ($1,100.00) was missing from the tips during the first and second weeks that they began monitoring the tip distributions. Subsequently, Defendants' employees' paystubs arrived late, and they were unable to immediately continue monitoring Defendants' tip payments.

191.    From in or around mid-2019 through in or around March 2020, various managers, including general manager "Mirna," "Josh," and "Doruk" appeared in the tip pool earning host or hostess points despite the fact that they typically only worked a maximum of thirty (30) minutes in this role when the restaurant was particularly busy. The majority of the time that these managers appeared on the tip chart, there were already two (2) hosts or hostesses assigned to the shift such that the managers were not needed in that role and did not truly perform the duties of a host or hostess.

192.    At various times throughout the relevant time period, Defendant Cinel included himself in the tip pool as a busser, despite the fact that he did not truly perform this work. Although Cinel, at most, poured water for a couple of tables, picked up a minimal number of empty glasses or chatted with customers, at no time did Plaintiffs ever observe Cinel performing the traditional functions of a busser for an extended period of time.

193.    After the restaurants reopened following the shutdown, Defendant Cinel strongly discouraged cash payments and implemented a policy that all payments must be issued via credit card. On two to three (2-3) occasions, Plaintiff Amaya observed Defendant Cinel take cash tips left by customers, stating that he was only going to pay servers credit card tips and would take the

cash for himself.

**Defendants' Unlawful Corporate Policies**

194.    Plaintiffs and the Collective and Class Members were all paid pursuant to the same corporate policies of Defendants, including failing to pay minimum wages, overtime premiums, and spread-of-hours premiums.

195.    Despite the fact that Plaintiffs regularly worked shifts in excess of ten (10) hours, they were not paid spread-of-hours premiums for such days.

196.    Throughout the Class Period and, upon information and belief, continuing until today, Defendants have likewise employed other individuals like Plaintiffs in positions that require little skill and no capital investment.

197.    Plaintiffs have spoken with other employees of Defendants who were similarly paid below minimum wage for all hours worked and did not receive overtime premium compensation for all hours worked in excess of forty (40) in a given workweek. Defendants' failure to pay Plaintiffs minimum wages for all hours worked and overtime premiums for hours worked in excess of forty (40) in a week is and has been a corporate policy of Defendants which has applied to all of their non-management restaurant employees throughout the Class Period.

198.    Defendants' failure to pay Plaintiffs spread-of-hours premiums for days in which they worked a spread of more than ten (10) hours and/or a split shift is and has been a corporate policy which applies to all of their non-management employees who worked more than ten (10) hours in a day and/or a split shift throughout the Class Period.

199.    Upon information and belief, Defendant Cinel rotated employees between the two Antique Garage locations in order to avoid having to pay overtime premiums.

200.    Throughout the relevant time period, Defendant Cinel frequently sent employees

home within one to two (1-2) hours of reporting for the shift if the restaurant was not busy or if Defendants had scheduled too many employees for the same shift. When this occurred, these employees were paid only for the time that they had reported for work and did not receive at least four (4) hours of call-in pay, as required by the NYLL. Plaintiffs recall that at least one (1) employee per week was sent home after working fewer than four (4) hours.

201.    Defendants did not notify Plaintiffs Montebon, Amaya, Palma or the Tipped Subclass Members whether they were relying upon the tip credit in calculating their wages in accordance with the requirements of the NYLL.

202.    To be eligible for the tip credit, employers of tipped personnel must allow employees to keep all of the tips that they receive. Because Defendants routinely violated the requirements for taking the tip credit (i.e., did not provide notice, and the owners pocketed some of the tips), Defendants were not entitled to pay Plaintiffs Montebon, Amaya, Palma or the Tipped Subclass Members the New York "tipped" minimum wage and instead were obligated to pay Plaintiffs Montebon, Amaya, Palma and the Tipped Subclass Members the full statutory minimum wage.

203.    Defendants did not provide Plaintiffs and the Class Members with proper wage statement or other breakdown containing an accurate accounting of the hours that they worked and their regular and overtime rates throughout the relevant time period.

204.    During their respective employment periods, Plaintiffs were not provided with annual wage notices or notices when their pay rates changed containing, *inter alia*, information regarding rates of pay, the amount of tip credit to be taken, or any deductions subtracted from Plaintiffs' wages, as required by the NYLL.

205.    Upon information and belief, throughout the Class Period and continuing until

today, Defendants failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

## FIRST CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID MINIMUM WAGE
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

206.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

207.    By failing to pay minimum wages for all hours worked, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 206 and 215(a)(2).

208.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

209.    Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon.

210.    By failing to notify Defendants' tipped employees that they were relying on the tip credit in calculating employees' hourly rates, Defendants lose the ability to utilize a tip credit against the FLSA's minimum wage.

211.    Plaintiffs and the Collective Action Members are entitled to recover from Defendants their full unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

212.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

213.    By failing to pay overtime at a rate not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

214.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

215.    Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Class Members)**

216.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

217.    Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay minimum wages for all hours worked, in violation of the NYLL and regulations promulgated thereunder.

*218.*    Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class

Members are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

## FOURTH CAUSE OF ACTION
## NEW YORK LABOR LAW – UNPAID OVERTIME
### (Brought on Behalf of Plaintiffs and the Class Members)

219.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

220.    Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

221.    Defendants' failure to pay overtime premium compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

## FIFTH CAUSE OF ACTION
## NEW YORK LABOR LAW – UNPAID SPREAD-OF-HOURS PREMIUMS
### (Brought on Behalf of Plaintiffs and the Class Members)

222.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

223.    Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay compensation in an amount equal to one hour's pay at the relevant minimum wage in all

instances where the Class Members worked either a split shift or more than ten (10) hours per day, in violation of the NYLL §§ 650, *et seq.*, and the regulations promulgated thereunder including N.Y. Comp. Code R. & Regs. tit. 12, §§ 137-1.7 (2010), 146-1.6 (2012).

224.    Defendants' failure to pay spread-of-hours compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq*.

**SIXTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PAY WAGES**
**(Brought on Behalf of Plaintiffs and the Class Members)**

225.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

226.    Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiffs and the Class Members are entitled to be paid all their weekly wages "not later than seven calendar days after the end of the week in which wages are earned." Thus, Defendants violated NYLL § 191 by failing to pay Plaintiffs and the Class Members all of their wages earned within the week such wages were due.

227.    Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employee," such as Plaintiffs and the Class Members, that is not otherwise authorized by law or by the employee.

228.    By withholding wages and overtime compensation from Plaintiffs and the Class Members, pursuant to NYLL § 193 and the cases interpreting same, Defendants made unlawful deductions in wages owed to Plaintiffs and the Class Members.

229.    Defendants' failure to pay Plaintiffs and the Class Members wages of any kind for certain hours that they spent attending mandatory staff meetings and completing assigned job duties past the end of their scheduled shifts violated NYLL §§ 191 and 193.

230.    Defendants' failure to comply with NYLL §§ 191 and 193 caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**SEVENTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE NOTICES**
**(Brought on Behalf of Plaintiffs and the Class Members)**

231.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

232.    Defendants have willfully failed to supply Plaintiffs and the Class Members notice as required by Article 6, § 195(1), in English or in the language identified by Plaintiffs and the Class Members as their primary language, containing Plaintiffs' and the Class Members' rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay day designated by the employer in accordance with the NYLL, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer' the physical address of the employer's main office or principal place of business, and a mailing address if

different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

233.    Due to Defendant's violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendant fifty dollars ($50.00) per employee for each day that the violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, §§ 190, *et seq.*, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

### EIGHTH CAUSE OF ACTION
### NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE STATEMENTS
#### (Brought on Behalf of Plaintiffs and the Class Members)

234.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

235.    Defendants have willfully failed to supply Plaintiffs and the Class Members with an accurate statement of wages as required by NYLL, Article 6, § 195(3), containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

236.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants two hundred and fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, §§ 190 *et seq.*, liquidated damages

as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

## NINTH CAUSE OF ACTION
## NEW YORK LABOR LAW – UNLAWFUL WITHHOLDING OF GRATUITIES
**(Brought on Behalf of Plaintiffs Montebon, Anaya and Palma and the Tipped Subclass Members)**

237.    Plaintiffs Montebon, Anaya and Palma, on behalf of themselves and the Tipped Subclass Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

238.    Defendants have willfully failed to compensate Plaintiffs Montebon, Anaya, Palma and the Tipped Subclass Members for all gratuities earned by withholding a portion of gratuities left by patrons for Plaintiffs Montebon, Anaya and Palma and the Tipped Subclass, in violation of § 196-d of the New York Labor Law. Accordingly, Defendants are required to compensate Plaintiffs Montebon, Anaya and Palma and the Tipped Subclass Members for all gratuities withheld by Defendants.

239.    Due to the Defendants' New York Labor Law violations, Plaintiffs Montebon, Anaya and Palma and the Tipped Subclass Members are entitled to recover from Defendants their unpaid gratuities, damages for unreasonably delayed payment of wages liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et al.*, 196-d.

## TENTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF FLSA
**(Brought on behalf of Plaintiff Montebon)**

240.    Plaintiff Montebon repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

241.    Plaintiff Montebon attempted to enforce his rights pursuant to the FLSA by

requesting clarification as to the manner in which Defendants were distributing his tips, as he did

not feel that he and his tipped coworkers were receiving all of the gratuities to which they were

entitled.

242.    Plaintiff Montebon's actions were protected activity under the FLSA.

243.    Defendants retaliated against Montebon by reducing his hours and subsequently

placing him on "on call" status indefinitely and refusing to assign him to any shifts, effectively

terminating him.

244.    By reducing Montebon's hours and ultimately refusing to assign him shifts,

Defendants violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29

U.S.C. §§ 215(a)(3).

245.    Plaintiff Montebon has suffered damages, including but not limited to loss of

wages, punitive damages and interest.

246.    As a result of Defendants' improper reduction of Montebon's hours and effective

termination of Plaintiff Montebon in violation of the FLSA, Plaintiff Montebon is entitled to relief

in the form of employment, reinstatement, promotion, the payment of wages lost, liquidated

damages, and any other necessary and proper relief.

### ELEVENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF NYLL
#### (Brought on behalf of Plaintiff Montebon)

247.    Plaintiff Montebon repeats and realleges each and every allegation of the preceding

paragraphs hereof with the same force and effect as though fully set forth herein.

248.    Plaintiff Montebon attempted to enforce his rights pursuant to the NYLL by

requesting clarification as to the manner in which Defendants were distributing his tips, as he did

not feel that he and his tipped coworkers were receiving all of the gratuities to which they were

entitled.

249.    Plaintiffs Montebon's actions were protected activity under NYLL § 215.

250.    Defendants retaliated against Montebon by reducing his hours and subsequently placing him on "on call" status indefinitely and refusing to assign him to any shifts, effectively terminating him.

251.    By reducing Montebon's hours and ultimately refusing to assign him shifts, Defendants violated and continue to violate NYLL § 215.

252.    Plaintiff Montebon has suffered damages, including but not limited to loss of wages, punitive damages and interest.

253.    As a result of Defendants' improper reduction of Montebon's hours and effective termination of Plaintiff Montebon in violation of the NYLL, Plaintiff Montebon is entitled to relief in the form of employment, reinstatement, promotion, the payment of wages lost, liquidated damages, and any other necessary and proper relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members, Class Members and Tipped Subclass Members, respectfully request that this Court grant the following relief:

a.    Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members;

b.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on behalf of the Class Members and Tipped Subclass Members and appointing Plaintiffs and their counsel to represent the Class and the Tipped Subclass;

c.      An order tolling the statute of limitations;

d.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

e.      An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

f.      An award of compensatory damages as a result of Defendants' failure to pay minimum wage and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.      An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

h.      An award of compensatory damages as a result of Defendants' failure to pay all wages to which Plaintiffs and the Class Members are entitled, pursuant to the NYLL and supporting regulations;

i.      An award of actual and liquidated damages for the non-payment of spread-of-hours pay for each split shift and/or shift worked in New York in excess of ten (10) hours;

j.      Fifty dollars ($50.00) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(1) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per Plaintiff and each of the Class Members, as provided for by NYLL, Article 6 § 198(1)-b;

k.      Two hundred and fifty dollars ($250.00) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(3) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per Plaintiff and each of the Class Members, as provided for by NYLL, Article 6 § 198(1)-d;

l.      An award of damages arising out of the non-payment of gratuities;

m.      An award of liquidated damages arising out of the non-payment of gratuities;

n.      An award of compensatory damages for lost wages, emotional distress, and pain and suffering caused by Defendants' retaliation against Plaintiff Montebon;

o.      An award of punitive damages under the FLSA and NYLL for retaliation;

p.      An award of prejudgment and post-judgment interest;

q.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

r.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
      May 27, 2021

Respectfully submitted,

**PELTON GRAHAM LLC**

By:

Brent E. Pelton (BP 1055)
pelton@peltongraham.com
Taylor B. Graham (TG 9607)
graham@peltongraham.com
Kristen E. Boysen (KB 0208)
boysen@peltongraham.com
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiffs and the putative
FLSA Collective and Classes*

Page **6** of **6**

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Antique Garage and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and/or for withholding gratuities earned, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.



Bencher Montebon

| Signature | Printed Name |

DocuSign Envelope ID: AFD10E74-1139-49A4-9A51-3F2D5D8A3E5D

Page **6** of **6**

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Antique Garage and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and/or for withholding gratuities earned, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

92707B6F7DB644B...

Andrea Amaya

Signature                                Printed Name

Page **6** of **6**

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Antique Garage and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and/or for withholding gratuities earned, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

DocuSigned by:

_____
9438D32580A0494

Signature

Noe Palma
_____
Printed Name

www.PeltonGraham.com

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Antique Garage Inc., AG Tribeca Inc., and/or their respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me overtime wages and minimum wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

_____         Cuahquentzi Esteban
Signature                       Printed Name

## CONSENTIMIENTO PARA SER UN DEMANDANTE

Por mi firma abajo yo autorizo la presentación y tramitación de una acción legal en mi nombre y representación en contra de Antique Garage Inc., AG Tribeca Inc. y sus respectivos propietarios, gerentes, oficiales, directores, sucesores, predecesores, subsidiarias y afiliados para que me sean pagadas las horas extras y los salarios mínimos tal como lo requieren las normas estatales y/o federales e igualmente autorizo la presentación de este consentimiento en la acción(es) con el fin de debatir la conducta ilegal. Yo autorizo ser nombrado como **demandante representativo** en esta acción legal para tomar decisiones en nombre y representación de otros demandantes a quienes pueda concernir el resultado de este proceso, el método y la manera en cómo debe llevarse a cabo este litigio y la decisión de llegar a un acuerdo dentro de la causa y todo lo que concierna a los honorarios profesionales y costas del proceso y cualesquiera otras decisiones relacionadas con este litigio. Yo entiendo que estaré representado por Pelton Graham LLC sin tener que pagar por anticipado costas u honorarios de abogados. Yo entiendo que, si los demandantes tienen éxito, los costos asumidos por los abogados en mi nombre serán deducidos inicialmente de la porción de mi acuerdo en una conciliación o como resultado de una sentencia en juicio. Yo entiendo que mis abogados podrán solicitar a la Corte que les sean retribuidos los honorarios y costas procesales por parte de los demandados en nombre mío. Yo entiendo que los valores de retención de los abogados podrán ser ya sea el monto recibido por parte de los demandados o el monto aproximado de 1/3 parte (33.33%) del total del acuerdo de conciliación o del valor obtenido a través de la sentencia (incluyendo honorarios), cual sea la suma más alta.

_____         Cuahquentzi Esteban
Firma                           Nombre Escrito

This is a complete and accurate translation of the English "Consent to Become a Party Plaintiff" form above.

**Notice of Shareholder Liability for Services Rendered**
**Pursuant to § 630 of the Business Corporation Law of New York**

Pursuant to the provisions of § 630 of the Business Corporation Law of New York ("NYBCL"), the ten (10) largest shareholders of ANTIQUE GARAGE, INC. and A. G. TRIBECA, INC. are hereby notified that the plaintiffs in this matter, individually and on behalf of the putative FLSA collective and the Class they seek to represent, intend to enforce your personal liability, as the ten (10) largest shareholders of ANTIQUE GARAGE, INC. and A. G. TRIBECA, INC. and to charge you with indebtedness of said corporations to the plaintiffs for services performed for the corporations as employees during the six (6)-year period preceding the filing of the complaint.

Services for the above-referenced corporation were terminated by plaintiffs within the past 180 days.

Dated: May 29 , 2021

Brent E. Pelton, Esq.

*Attorneys for Plaintiffs and the putative*
*FLSA Collective and Classes*

61